## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

**JT HOLLADAY FARMS, LLC,**
**JASON HOLLADAY, and**
**ASHLEY HOLLADAY,**

      Plaintiffs,

v.

**FIRST CITIZENS BANK LUVERNE,**

  Defendant.

Case No.:

## COMPLAINT

COME NOW the Plaintiffs, JT Holladay Farms, LLC, Jason Holladay, and Ashley Holladay (collectively "Plaintiffs"), by and through their undersigned counsel, and file this Complaint against Defendant, First Citizens Bank Luverne ("Defendant" or "Bank"), alleging as follows:

### JURISDICTION AND VENUE

1. This Court has federal question jurisdiction under 28 U.S.C. § 1331 for claims arising under the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691 et seq., and violations of FDIC regulations. Supplemental jurisdiction exists over state law claims under 28 U.S.C. § 1367.

2. Venue is proper in the Middle District of Alabama pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in Crenshaw County, Alabama, including the execution and

administration of the loan agreements.

## PARTIES

3.  Plaintiff JT Holladay Farms, LLC, ("the Farm") is a limited liability company organized under the laws of Alabama, with its principal place of business at 2375 S Moodys Crossroads Rd, Rutledge, AL 36071.

4.  Plaintiff Jason Holladay is an individual residing at 2375 S Moodys Crossroads Rd, Rutledge, AL 36071, and is a member and guarantor of JT Holladay Farms, LLC.

5.  Plaintiff Ashley Holladay is an individual residing at 2375 S Moodys Crossroads Rd, Rutledge, AL 36071, and is a member and guarantor of JT Holladay Farms, LLC.

6.  Defendant First Citizens Bank Luverne ("the Bank") is a state-chartered, FDIC-insured commercial bank with its principal office at 100 West Third Street, Luverne, AL 36049, conducting business in Crenshaw County, Alabama, and is a subsidiary of First Citizens-Crenshaw Bancshares, Inc., a Delaware Corporation.

7.  The Bank is creditor as that term is defined by 12 C.F.R. § 1002.2(l), as regularly participates in the decision to extend, renew, or continue credit, or regularly arranges for such credit.

8.

## FACTUAL ALLEGATIONS

9.  The Holladay family are lifelong Alabama farmers, involved in various farming such as row-crop farming and poultry. Like most American farmers, the farm operation requires incurring liabilities, most notably here with the Bank.

10. Since 1980, the Holladay family has maintained a business relationship with the Bank, initially under the presidency of John Harrison, with whom Jerry Holladay, Jason's father, conducted business for 30 years.

11. In 2010, the Bank underwent significant changes, including acquiring First Lowndes Bank, expanding its Luverne building, and appointing William Petrey as president following John Harrison's departure. Around this time, John Giles began working at the Bank and developed a close friendship with Jason Holladay.

12. In late 2017, Mr. Giles encouraged Jason to pursue a political career, introducing him to influential figures, and urged Mr. Holladay to transfer the Farm's poultry operation loan (the "chicken note") from Alabama Ag Credit to the Bank. The Bank promised favorable terms, including matching the current interest rate at Alabama Ag Credit, to build the Plaintiffs trust, which the Bank later exploited.

13. In 2018, when the Farm transferred the poultry operation loan to the Bank, it

was secured by ten (10) poultry houses, ten (10) Poultry Houses, located on multiple parcels (Swanner Place – 92.9 acres, Rodgers Place - 81 acres, Sessions Place - 60.17 acres, Kent Place - 88.62 acres, Powell Place - 20.77 acres, plus  8 acres of a 38 acre parcel at the Moody Place), the Holladay's' 5,000 sq.ft. home at 2375 S Moodys Crossroads Rd, Rutledge, AL 36071, and various equipment.

14. The Farm operates as a contract grower for poultry, a common arrangement in the poultry industry where growers invest in facilities (e.g., poultry houses, and rely on integrator payments.

15.  The Farm operates under a contractual agreement with Wayne Sanderson (WS), the poultry integrator. WS delivers chicks to the Farm, which grows them to WS's specifications. Upon transport back to WS, the Farm is paid based on the weight of the birds.

16. The Bank was aware of the Farms' contractual relationship with WS and reliance on WS for revenue, and in fact, revenue from WS was paid directly to the Bank, and the Bank in turn dictated how the funds were applied to the Farm's bank loans.

17. In Spring 2021, the Farm decided to remodel and upgrade their 16 poultry houses due to age. He provided his plan to the Bank, and William Petry agreed to use the collateral they already had (the 10 poultry houses, land, and

the Holladay's' home) and add the other six (6) poultry houses and 40 acres of land, for an estimated $2 million loan. In June 2021, the Farm began the remodel but opted to self-contract the remodel, which reduced the loan need to $1.4 million, but the Bank's requirement for collateral remained unchanged.

18. In other words, the collateral that was sufficient to secure the $2 million loan, was used to secure only a $1.4 million loan, leading the Plaintiffs to believe they would have cushion should they need additional funds.

19. In October 2021, supply chain issues due to COVID-19 and increased labor costs following Jerry Holladay's death in August 2021 necessitated an additional $300,000 loan from the Bank. The Bank demanded the Holladay's use the 210-acre Bolling Place as collateral, despite prior assurances that the existing collateral sufficed for the $2 million approved just 3 months earlier in June 2021.

20. In March 2022, the Farm needed an additional $230,000 to finish the upgrades and get chickens back on the farm. The Farm was without income and needed to get poultry operation back business as soon as possible. Again, the Bank demanded more collateral even though the total loan was still less than the original agreed upon $2 million. Knowing the Plaintiffs had no options, the Bank required the Holladay's to mortgage 160 acres of the

Moody Place, part of Jerry Holladay's estate in probate, despite an agreement to use only the S. Moodys Crossroads Rd. property.

21. When the Holladay's protested, in order to induce the Holladay's to pledge the properties and extend their liability as guarantors, William Petrey assured them the Bank would release the Bolling and Moody properties after 12 months.

22. This assurance was reduced to writing, but the Bank failed to honor this release agreement after 12 months.

23. On March 31, 2022, JT Holladay Farms, LLC, executed a Promissory Note (Loan #xx8518) with the Bank for $3,504,000.00, with Jason and Ashley Holladay as guarantors, consolidating prior loans (e.g., #xx7134, #xx7135, #xx883), advancing new funds of $302,157.18 to the Farm, and taking additional collateral, including property owned by the Holiday. (The promissory Note, Mortgages and Guaranty Agreements are exhibited in Claim 9-1,attached hereto as *Exhibit A).*

24. These monies addressed a myriad of farming expenses but primarily were used to fund the expense of 16 poultry houses situated on three separate parcels of the Holiday' real estate.

25. This relationship underscores the Farm's reliance on WS for revenue, influencing the purpose of the $3,504,000 loan executed on March 31, 2022

(paragraph 14), which funded poultry house upgrades to meet WS's standards.

26. Pursuant to 12 C.F.R. § 1002.2(e), "Applicant" includes guarantors contractually liable for credit. Jason and Ashley Holladay, as guarantors, are applicants under ECOA.

27. Pursuant to 12 CFR 1002.2 (g) "Business credit" refers to extensions of credit primarily for business or commercial (including agricultural) purposes.

28. Pursuant to 12 CFR 1002.2 (j) "Credit" means the right granted by a creditor to an applicant to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment therefor.

29. Plaintiffs Jason and Ashley Holladay are guarantors, making them applicants under ECOA, 12 C.F.R. § 1002.2(e), as they are contractually liable for the debt (12 C.F.R. § 1002.2(i)).

30. The Holladay's received no separate consideration for signing as guarantors.

31. The Bank conducted an internal appraisal in 2022 for the $3,504,000.00 loan. Said valuation is covered under 12 C.F.R. § 1002.14(b)(3).

32. The collateral included in the appraisal included the Plaintiffs' dwelling, making the appraisal subject to ECOA's disclosure rules under 12 C.F.R. § 1002.14 and triggering the disclosure requirement under ECOA, 15 U.S.C. § 1691(e), and 12 C.F.R. § 1002.14.

33. The Bank was required to provide the appraisal to JT Holladay Farms, LLC, and guarantors Jason and Ashley Holladay (as applicants under 12 C.F.R. § 1002.2(e)) upon completion or before loan consummation in March 2022. The failure to do so, as alleged, constitutes a violation of ECOA.

34. This left the Holladay's unaware of the valuation affecting their personal liability.

35. The Bank's withholding of critical information evidence that the guaranties were imposed without full disclosure, a factor courts consider in sham guaranty claims.

36. The Promissory Note provided for a 5.59% interest rate, two quarterly interest-only payments starting June 30, 2022, and 60 quarterly principal and interest payments of $87,104.52 starting March 30, 2023, with a maturity date of September 30, 2037.

37. By late 2022, 10 poultry houses were operational, and by January 2023, all 16 were functioning.

38. Plaintiffs paid $150,000 in interest to the Bank before full operation, contrary to their agreement with Bank that payments would not be due until renovation completion, in the least, evidencing misaligned expectations.

39. Following the completed  renovation, the Bank refused to reappraise the upgraded poultry houses or release the excess collateral as promised.

40. In January 2023, the Plaintiffs submitted a completed application (12 C.F.R. § 1002.2(f)) for a $20,000 loan for shavings and gas, which the Bank denied, forcing the Farm to miss a flock cycle.

41. Under 12 C.F.R. § 1002.9(a)(1), a creditor must notify an applicant of an adverse action within 30 days after receiving a completed application.

42. An "adverse action" includes the denial of an application for credit, as defined in 12 C.F.R. § 1002.2(c)(1)(i).

43. The notice must include a statement of reasons for the denial. (12 C.F.R. § 1002.9(a)(2)).

44. 12 C.F.R. § 1002.9(c)(1)(i) provides an exception to the notice requirement if the creditor has previously notified the applicant in writing of the specific reasons for denying an advance or additional credit, and the denial is based on the same reasons.

45. The Promissory Note and the Guaranty Agreements lack an explicit provision allowing denial of additional advances upon default without prior notice, and no such notice was provided, nor was there any prior notice otherwise explicitly informing the Plaintiffs that future advances may be denied under specific reasons for denying an advance or additional credit.

46. Without this precondition, the Bank was not excused from providing the required adverse action notice but failed to do so.

47. The Bank failed to provide an adverse action notice to the Plaintiffs within 30 days, as required by 12 C.F.R. § 1002.9(a)(1), violating ECOAs requirements. This caused the Plaintiffs to be confused as to their credit options and lack understanding as to how to correct the reasons for denial, adding stress and worry to the Plaintiffs.

48. In March 2023, to cover bills due to the Bank's denial. the Holladays mortgaged an 80-acre parcel known to the Plaintiffs as "Beardeux Place" to a private individual Randall Parker for $100,000 at 8.5% interest.

49. Due to the Farms' growing methods, the average weight of each bird was very consistent, so based on the number of birds and average weight the Farm knew the expected payout each turn should yield. In June 2023, Plaintiffs discovered discrepancies in bird weights reported by WS, and suspected unrecorded truckloads which decrease the payouts to the Farm. The Farm questioned the amount of compensation WS paid to the Farm.

50. In August 2023, Ashley Holladay submitted a completed application (as defined by 12 C.F.R. §1002.2(f)) for a $350,000 loan ( n a request for credit under 12 C.F.R. 1002.2(j), to clear the remodel debts. As part of the application, she provided evidence of the Farms's cash flow to support the loan.

51. The Farms annual gross income was $800,000 with $10.8 million projected

over 13.5 years.

52. The Bank denied the loan, citing insufficient cash flow, despite overcollateralization of the existing loan.

53. The August 2023 denial constituted an adverse action under 12 C.F.R. § 1002.2(c)(1)(i). The Bank  was required to provide a written statement of reasons by September 2023 (within 30 days, 12 C.F.R. § 1002.9(a)(2)), but failed to do so, violating ECOA, 15 U.S.C. § 1691(d), and 12 C.F.R. § 1002.9.

54. Neither the Promissory Note nor the Guaranty Agreement explicitly state that additional advances could be denied upon default without prior notice, and no evidence exists of such notice.

55. As guarantors and applicants, Jason and Ashley Holladay were entitled to notice regardless of delinquency exceptions.

56. The Plaintiffs were again left in a cloud of confusion as to reason for the adverse action of the Bank, particularly when the poultry houses had been upgraded, and the value of the collateral had increased. However, without proper notice of the reason for denial, the Plaintiffs could not take action to remedy the reason for denial and were left with no other alternative credit options.

57. The Bank did suggest selling the cattle herd so the Farm could acquire

revenue and not pay the Bank anything on the $300,000 cattle loan, and the Bank would instead use real estate as collateral. However, the Bank had the cattle as collateral and failed to release the UCC lien for the cattle, hindering cattle sales.

58. More perplexing is that questions - if there was enough real estate to cover the cattle loan wasn't there enough real estate to cover the loan Ashley requested?

59. Also in August 2023, following the Farms' application for $350,000.00, WS unexpectedly sent a lengthy list of demands to the Farm regarding the poultry houses that had to be met before WS would bring more chickens. At this time, the Plaintiffs began to suspect target action by WS.

60. The Farm managed to pay for the necessary items on the list and readied itself for more deliveries.

61. The Gramm-Leach-Bliley Act (GLB Act), enacted in 1999, includes privacy protections for borrowers' nonpublic personal information (NPI) held by financial institutions, primarily under Title V, Subtitle A (15 U.S.C. §§ 6801-6809), and implemented through regulations like 12 C.F.R. Part 1016 (Regulation P) by the Consumer Financial Protection Bureau (CFPB).

62. In December 2023, Mike Johnson and Joey Carpenter revealed to Jason that Bank employees had disclosed sensitive details about the Plaintiffs' business

loans (Loan #xx8518 and related loans), including loan balances, payment

status, and stated the loans were in financial distress, without Plaintiffs'

consent.

63. Based on this nonpublic information disclosed by the Bank, Johnson knew

the Farm was struggling and had heard the Plaintiffs may lose it to the Bank.

Jason was shocked when Johnson offered to purchase the property to save the

Farm from the Bank, felt exploited due to their disclosure of the Farms'

financial trouble, was caused humiliation, embarrassment and anger that the

Farm's private financial information had been disclosed.

64. After the initial discussion with Johnson and Carpenter, Jason meet with

Carpenter again to further inquire about the Bank's disclosures. Carpenter

further revealed his knowledge of private information wrongfully disclosed

by the Bank. At this meeting Carpenter seemed shaken and began to reveal

extremely sensitive financial and business operations information, informed

Jason that  Johnson was on the board of the Bank and indicated that the Bank

and WS were working together against the Farm.

65. This confirmed Jason's suspicions of collusion between the Bank and WS,

linking the timing and actions of WS's unusual and unnecessary demands for

poultry house improvements.

66. This disclosure violated the Gramm-Leach-Bliley Act (15 U.S.C. § 6801 et

seq.), Alabama Code § 5-5A-43, and constituted an invasion of privacy under Alabama common law, causing financial losses, emotional distress, and reputational harm.

67. Since late 2023 the Farms' contract with integrator WS has not been honored, and no chicken have been delivered to the Farm. Without a contract with the integrator and a stream of income from growing chickens, Plaintiffs were without the ability to service their liabilities to the Bank.

68. In January 2024, Plaintiffs lost chickens due to propane shortages from unpaid gas bills included in the $350,000 loan request.

69. In January 2024, Jason met with Ryan Bagents, former employee the Bank

70. Bagents informed Jason that he had been on the preliminary loan committee for the 2022 loan and assigned the task of "running the numbers" during the process of getting the Farm loan updated and approved.

71. Bagents advised that the loan committee and board of directors were warned that according to the numbers, Farm operation would not cash flow.

72. When he spoke up in opposition of the loan at a committee meeting, he was harshly shut down and his opinion disregarded. Bagents was terminated from his employment at the Bank shortly after the meeting.

73. Bagents expressed his opinion that the Bank was unfairly dealing with the Plaintiffs.

74. Bagents also mentioned that a male employee from the Ft. Deposit branch of First Citizens Bank had recently contacted him, after his departure, asking questions about the Holladays and the Farm.

75. Bagents also suggested that the Holladays go to the Bank and ask for their CIP, Customer Information Profile, which would contain all of their financial information. The Plaintiffs requested the same in March 2024 at a meeting with Mr. Sanders, but the Bank refused to provide it.

76. In February 2024, the Bank accelerated all loans, setting a May 31, 2024, deadline, later extended 90 days.

77. The Bank failed to pay the property insurance premium, causing cancellation, contrary to past practices.

78. In March 2024, Plaintiffs listed some of the poultry houses for sale with Poultry South. Critical to the value of the sale, is an ongoing agreement with an integrator, which was WS. WS had confirmed no updates were needed to the poultry houses but later refused a sales contract for all 16 houses to a new buyer, hindering the sale.

79. In May 2024, the Bank denied a forbearance request.

80. On August 15, 2024, the Bank posted nine foreclosure notices in The Luverne Journal, including a parcel not agreed upon as collateral and listing multiple mortgages on the same properties despite prior releases, setting a

sale date of September 5, 2024. (Attached hereto, as *Exhibit B)*.

81. On September 4, 2024, Plaintiffs filed Chapter 12 bankruptcy (Case 24-31969), scheduling the Bank as a secured creditor, with a disputed debt in the amount of $3,177,712.00. (The Petition is attached hereto, *Exhibit C*).

82. The Bank filed four (4) proofs of claim (POC) 7, 8, 9, and 10 on October 29, 2024. POC 7 was filed in the amount of $19,675.82, fully secured by real estate mortgages. POC 8 was filed in the amount of  $25,934.10, fully secured by cattle. POC 9 was filed in the amount of in the amount $3,572,091.78, fully secured by real estate mortgages and equipment (via UCC-1). POC 10 was filed in the amount of $373,351.82 and  fully secured by real estate and equipment (via UCC-1). (The POCs are attached hereto, as *Exhibits A, D, E, F.*)

83. The Bank sought relief from stay, citing lack of insurance, which the Bank caused by not advancing premiums.

84. Plaintiffs secured property insurance with certified checks on October 22, 2024.

85. The bankruptcy plan was denied, and the case dismissed on March 12, 2025.

86. On April 11, 2025, the Bank sent a notice of default and acceleration, demanding $4,000,000 (attached hereto, as *Exhibit G*) and  foreclosure sale notices listing ten mortgages, including nonexistent or superseded ones (e.g.,

July 28, 2021; May 8, 2020) and setting a foreclosure sale date of May 8, 2025. (Attached hereto, as *Exhibit H*).

87. The foreclosure sale was postponed to May 29, 2025 after the Plaintiffs protested that the Bank failed to provide them with a full 30 days to dispute the debt pursuant to their rights under the Fair Debt Collection Practices Act. (Attached hereto as *Exhibit I*).

88. On April 21, 2025, the Plaintiffs did dispute the $4 million demand, via certified mail, noting discrepancies in the demanded amount, the addition of a tenth mortgage, and requested an itemized breakdown of the debt, which was requested on several previous occasions but not provided. Further, because the Plaintiffs had never received the appraisals, despite previous requests, they requested copies of the same. (Attached hereto as *Exhibit J*).

89. The Bank's April 29, 2025, response entitled "Statement of Debts Owed" dated lists four loans but does not constitute a proper itemization, as it fails to specify the applicable interest rates for each loan, fails to provide the methodology used to calculate the listed interest amounts (e.g., $25,726.00 for Loan #xxx754 and $281,033.75 for Loan #xxx518), and include amounts for certain listed expenses, such as Shelby Co News that are impermissible charges to the loans. Additionally, the Bank did not provide the requested accounting documents or appraisals, further complicating the Plaintiffs'

understanding of the debt and property valuation and further obscuring their exposure.(Attached hereto as *Exhibit K).*

81. Plaintiffs' online records show loan balances as of May 5, 2025: $3,383,999.88 (#8518), $15,000.00 (#8794), $19,724.07 (#9212), $300,329.25 (#5754), totaling $3,719,053.20, below the $4 million demand.

82. Plaintiffs estimate the collateral's fair market value at $6,440,997.00, indicating overcollateralization of the loans. (Attached hereto as *Exhibit L).*

83. The Bank's actions, including payment misapplication contributing to a $388,025.89 discrepancy between the documented payoff of $4,107,079.09 and the Plaintiffs' recorded balance of $3,719,053.20; overcharging interest in the amount of $281,033.75 without clear justification under the 5.59% rate; assessing improper late fees of $446.46 and others totaling $677.78 despite no breakdown of said calculations; and capitalizing unauthorized expenses of $74,941.93, including improper Shelby Co News charges totaling $21,017.13 for a Crenshaw County property, and questionable charges from Parnell and Parnell in the amount of $18,589.48 and Lee and Mason in the amount of $16,883.49 without itemization, violate the Promissory Note and FDIC regulations §12 C.F.R. Part 364.

84. The Bank's conduct has caused financial harm, including increased costs, lost sales, and foreclosure risks.

85. Each Mortgage securing the loans, on page 4, specifies that any foreclosure sale must occur in Crenshaw County at the front door of the courthouse.

86. On May 29, 2025, the Bank conducted a foreclosure sale of the Plaintiffs' properties, but the sale was held inside the Crenshaw County Chambers room, not at the front door of the courthouse, violating the Mortgage terms and Alabama Code § 35-10-13, which mandates that non-judicial foreclosure sales to be held at the front door of the courthouse in the county where the property is located.

87. Prior to the May 29, 2025, foreclosure sale, the Holladays filed a complaint against the Bank  in Crenshaw County Circuit Court, Civil Action No.: 24-CV-2025-900016.00, seeking a Temporary Restraining Order (TRO) to stop the sale, citing the Bank's failure to provide proper accounting and notice and exhibiting the demands and sale notices from Poole and Poole.

88. The case was assigned to Judge Cleveland Poole, brother of Calvin Poole. Judge Poole allowed the sale to proceed, and ordered the Bank to temporarily withhold filing of the foreclosure deed for a short time, until a hearing could be held on the TRO.

89. The foreclosing attorney, Calvin Poole, also acted as the auctioneer during the May 29, 2025 sale.

90. Given that Calvin's brother, Hon. Cleveland Poole, is the assigned Circuit Court Judge on the case, the Plaintiffs had serious concerns about the Bank's unfair influence over the Holladays' property and dismissed the case, without prejudice, to cure their fears of impartiality toward the Bank.

91. Despite the void foreclosure sale and result invalid deed, the Bank filed the deed in the Crenshaw County Probate records and has demanded that the Plaintiffs vacate the property by way of an illegal demand from Poole and Poole. (Attached hereto as *Exhibit M*).

## CAUSES OF ACTION
## COUNT I: BREACH OF CONTRACT

92. The Promissory Note, Mortgages, and Guaranty Agreements constitute valid contracts.

93. The Bank breached these contracts by:

a. Misapplying payments, causing a $388,025.89 discrepancy between the $4,107,079.09 payoff and the $3,719,053.20 recorded balance, overcharging interest ($281,033.75), assessing improper late fees ($677.78), and capitalizing unauthorized expenses ($74,941.93, including $21,017.13 for Shelby Co News).

b. Failing to release collateral (Bolling and Moody properties) as promised after 12 months.

c. Violating the nonjudicial sale provision in each Mortgage, which on page 4

requires that any foreclosure sale be conducted at the front door of the

courthouse in Crenshaw County when on May 29, 2025, the Bank illegally

held the foreclosure sale inside the Crenshaw County Chambers room, in

breach of this contractual term and Alabama Code § 35-10-13.

d. Breaching the implied covenant of good faith by engaging in conduct that

frustrated the Plaintiffs' reasonable expectations under the contracts;

disclosing sensitive loan details to third parties in December 2023, violating

the Gramm-Leach-Bliley Act (15 U.S.C. § 6801 et seq.), Alabama Code § 5-

5A-43, violating their privacy and exploiting their financial vulnerability,

which was egregiously unfair compounding their plight; sudden denials of

credit advances without notice or notice of the denials; refusal to provide

appraisals of the properties; failure to release the UCC lien impacting cattle

sales which compounded the Plaintiffs' financial bind; refusal to provide

itemized accounting of the debt; and accelerating loans without prior

warning, all of which were designed to exploit the Plaintiffs' financial

vulnerability and force them into foreclosure.

94. As a result, Plaintiffs suffered damages, including excess payments, lost

opportunities, legal costs, and property losses from the improper foreclosure.

## COUNT II: VIOLATION OF EQUAL CREDIT OPPORTUNITY ACT (ECOA)

95. The Bank is a creditor subject to ECOA, which prohibits discrimination and

requires specific disclosures and notices to applicants.

96. On March 31, 2022, the Bank extended credit to JT Holladay Farms, LLC, under Loan #138518, secured by a first lien on the Plaintiffs' dwelling at 2375 S Moodys Crossroads Rd, Rutledge, AL 36071.

97. Jason Holladay and Ashley Holladay, as guarantors contractually liable for the debt, are "applicants" under 12 C.F.R. § 1002.2(e).

98. The Bank conducted an internal appraisal in 2022, which included the valuation of the Holladay's dwelling, qualifying it as an "appraisal" or "other written valuation" under 12 C.F.R. § 1002.14(b)(3).

99. The Bank failed to provide a copy of this appraisal to JT Holladay Farms, LLC, Jason Holladay, or Ashley Holladay upon completion or at least three business days before loan consummation on March 31, 2022, violating 15 U.S.C. § 1691(e) and 12 C.F.R. § 1002.14(a)(1).

100.    In January 2023, the Plaintiffs submitted a completed application (12 C.F.R. § 1002.2(f)) for a $20,000 loan for shavings and gas, which the Bank denied, which caused the Farm to miss a flock cycle.

101.    Under 12 C.F.R. § 1002.9(a)(1), a creditor must notify an applicant of an adverse action within 30 days after receiving a completed application.

102.    An "adverse action" includes the denial of an application for credit, as defined in 12 C.F.R. § 1002.2(c)(1)(i).

103.     The notice must include a statement of reasons for the denial. (12 C.F.R. § 1002.9(a)(2)).

104.     12 C.F.R. § 1002.9(c)(1)(i) provides an exception to the notice requirement if the creditor has previously notified the applicant in writing of the specific reasons for denying an advance or additional credit, and the denial is based on the same reasons.

105.     The Promissory Note and the Guaranty Agreements lack an explicit provision allowing denial of additional advances upon default without prior notice, and no such notice was provided, nor was there any prior notice otherwise explicitly informing the Plaintiffs that future advances may be denied under specific reasons for denying an advance or additional credit.

106.     Without this precondition, the Bank was not excused from providing the required adverse action notice but failed to do so.

107.     The Bank failed to provide the statement for the reasons of denial, as required by 15 U.S.C. § 1691(d) and 12 C.F.R. § 1002.9(a)(2).  which caused the Plaintiffs to be confused as to their credit options or understand how to correct the reasons for the denial, and distress and worry.

108.     On August 15, 2023, Ashley Holladay submitted a completed application for a $350,000 loan, providing financial documentation showing sufficient cashflow to fund the loan.

109.     The Farm's annual gross income was $800,000 with a $10.8 million
projection over 13.5 years.

110.     The Bank denied this application in August 2023, constituting an
"adverse action" under 12 C.F.R. § 1002.2(c)(1)(i).

111.     The August 2023 denial constituted an adverse action under 12 C.F.R.
§ 1002.2(c)(1)(i). The Bank  was required to provide a written statement of
reasons by September 2023 (within 30 days, 12 C.F.R. § 1002.9(a)(2)), but
failed to do so, violating ECOA, 15 U.S.C. § 1691(d), and 12 C.F.R. §
1002.9.

112.     Neither the Promissory Note nor the Guaranty Agreement explicitly
state that additional advances could be denied upon default without prior
notice, and no evidence exists of such notice.

113.     As guarantors and applicants, Jason and Ashley Holladay were entitled
to notice regardless of delinquency exceptions.

114.     The Plaintiffs were again left in a cloud of confusion as to reason for
the adverse action of the Bank, particularly when the poultry houses had been
upgraded, and the value of the collateral had increased. However, without
proper notice of the reason for denial, the Plaintiffs could not take action to
remedy the reason for denial and were left with no other alternative credit
options.

115.    The Bank violated 12 C.F.R. § 1002.9 by failing to provide written

adverse action notices for the $20,000 and $350,000 denials, which affected

the Holladays' ability to manage their guarantor obligations tied to the

Farm's WS contract revenue (paragraph 103), increasing their financial risk

without transparency.

116.    These violations caused financial strain, confusion, and lost

opportunities, entitling Plaintiffs to actual damages, punitive damages up to

$10,000 per Plaintiff, and attorney's fees (15 U.S.C. § 1691e).

### COUNT III: NEGLIGENCE OR WANTON VIOLATION OF FDIC REGULATIONS, UNSOUND PRACTICES AND PRIVACY VIOLATION

117.    The Bank, an FDIC insured Bank, violated 12 C.F.R. Part 364 by:

a. Misapplying payments and overcharging interest.

b. Imposing improper fees and unauthorized expenses.

c. Engaging in predatory lending, as alleged by former employee Ryan

Bagents.

d. Colluding with WS to undermine Plaintiffs' operations.

e. Disclosing sensitive business loan details to third parties in December

2023, violating the Gramm-Leach-Bliley Act (15 U.S.C. § 6801 et seq.),

Alabama Code § 5-5A-43, and 12 C.F.R. Part 364, Appendix B, exploiting

their financial vulnerability, which was egregiously unfair, and  compounded

their plight.

118.    As a result of the Bank's negligent and or wanton conduct, the

Plaintiffs have suffered actual damages, including increased financial strain

and emotional distress.

**COUNT IV: INVASION OF PRIVACY (ALABAMA COMMON LAW)**

119.    In December 2023, the Bank disclosed sensitive financial information

about the Plaintiffs' business loans (e.g., Loan #xx8518) to private citizens

Mike Johnson and Joey Carpenter without consent, including loan balances,

payment status, and financial distress.

120.    This information constitutes nonpublic personal information under 15

U.S.C. § 6809(4) and private facts under Alabama common law.

121.    The disclosure was highly offensive, exposing the Plaintiffs' financial

vulnerability to third parties who exploited it, causing embarrassment,

financial pressure, and reputational harm.

122.    The information was not of legitimate public concern.

123.    The disclosure violated Alabama Code § 5-5A-43 and the Gramm-

Leach-Bliley Act, constituting negligence per se.

124.    The disclosures were intentional, as suggested by Carpenter's claim of

collusion with WS.

125.    As a result, Plaintiffs suffered financial losses, emotional distress, and

reputational harm, warranting compensatory and punitive damages.

## COUNT V: DECLARATION THAT THE FORECLOSURE SALE IS VOID

126.     Each Mortgage securing the loans, on page 4, requires that any foreclosure sale be conducted in Crenshaw County at the front door of the courthouse, consistent with Alabama Code § 35-10-13, which mandates that non-judicial foreclosure sales occur at the front door of the courthouse in the county where the property is situated.

127.     On May 29, 2025, the Bank conducted a foreclosure sale of the Plaintiffs' properties, but the sale was held inside the Crenshaw County Chambers room, not at the front door of the courthouse, violating the Mortgage terms and Alabama Code § 35-10-13, adding to the Bank's unfair treatment of the Plaintiffs by denying them a public and transparent sale process.

128.     The foreclosing attorney, Calvin Poole, acted as the auctioneer during the May 29, 2025 sale.

129.     Under Alabama law, non-judicial foreclosure sales require strict compliance with statutory requirements, as established in *Stiff v. Equivest Financial, LLC*, 2020 WL 3496934 (Ala. June 26, 2020), which voided a tax

sale for being held inside a courthouse rather than at the front door, a requirement mirrored in § 35-10-13 for foreclosure sales.

130.    The Bank's failure to comply with the mandated sale location, renders the May 29, 2025, foreclosure sale void under Alabama law, a final act of unfairness against the Holladays.

131.    As a result, Plaintiffs seek a declaration that the foreclosure sale is void and an order restoring title to the properties, along with damages for losses incurred due to the improper and unfair sale process.

## COUNT VI: INVALID SHAM GUARANTY

132.    On March 31, 2022, the Farm executed a Promissory Note for $3,504,000 (Loan #xx8518) with the Bank, with Jason and Ashley Holladay signing as guarantors. The loan was secured by extensive collateral, including the Holladays' dwelling and poultry houses, valued at $6,440,997.00.

133.    The Farm operates under a contractual agreement with WS, a poultry integrator, which delivers chicks to the Farm to be grown to WS specifications, with payment based on bird weight, generating approximately $800,000 annually from 16 poultry houses. This revenue stream, combined with the overcollateralized assets, provided sufficient security for the loan without personal guaranties.

134.    The Bank failed to provide the Holladays with the 2022 appraisal of their dwelling, required under 12 C.F.R. § 1002.14, depriving them of informed consent regarding their guarantor liability. Additionally, the Bank pressured the Holladays to add collateral (Moody Place) with an unfulfilled promise to release it after 12 months, which further evidences manipulation in imposing the guaranties.

135.    The guaranties lack economic substance, as the Farm's WS contract revenue and the $6,440,997.00 in collateral far exceed the $3,504,000 loan amount, indicating the guaranties were unnecessary and served as a pretext to impose personal liability on the Holladays.

136.    Under Alabama law, a guaranty must be supported by consideration and executed knowingly and the Bank's actions, including withholding critical appraisal information and leveraging unfulfilled promises, breaching the implied covenant of good faith and fair dealing, rendering the guaranties unenforceable as sham obligations.

137.    As a direct and proximate result of the Bank's imposition of sham guaranties, the Holladays have suffered financial harm, including personal exposure to a $4,107,079.09 debt demand, loss of equity in their dwelling, and emotional distress.

138.    The Plaintiffs are entitled to rescission of the guaranties, declaratory

relief invalidating their enforceability, and damages, including compensatory and punitive amounts, to remedy the Bank's wrongful conduct.

WHEREFORE, the Plaintiffs, Jason Holladay and Ashley Holladay, respectfully request that this Court:

a. Judgment on all counts.

b. Compensatory damages for breach of contract, including excess interest, late fees, unauthorized charges, and losses from the improper foreclosure sale.

c. Under ECOA, actual damages, punitive damages up to $10,000 per Plaintiff, and attorney's fees and costs to remedy the Bank's unfair treatment.

d. An order correcting the loan records to reflect proper payments and removing improper charges.

e. An injunction against further foreclosure actions until proper accounting is provided.

f. A declaration that the May 29, 2025, foreclosure sale is void, with restoration of title to the properties and damages for losses incurred due to the unfair sale process.

g. Declare the guaranties executed on March 31, 2022, as sham and unenforceable;

h. Award compensatory damages for financial losses and emotional

distress;

i. Award punitive damages for the Bank's bad faith conduct; e

j. Grant such other and further relief as the Court deems just and

proper.

## **JURY DEMAND**

Plaintiffs demand a jury trial.



Dated: June 19, 2025



/s/ Rhonda Steadman Hood
Rhonda Steadman Hood (HOO024)
HOOD & LAY, L.L.C.
1117 22nd Street South, Ste. 101
Birmingham, AL 35205
(205) 323-4123
(205) 776-2040 fax
rhonda@whlfirm.com

Service Address:
First Citizens Bank Luvern
c/o William W Petrey
100 West Third St
Luverne, AL 36049